# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | |
|---|---|
| KRISTEN ELAINE HITCHCOCK, | § |
| | § |
| Plaintiff, | § |
| | § |
| v. | §  Civil Action No. 3:17-CV-3164-BH |
| | § |
| NANCY A. BERRYHILL, ACTING, | § |
| COMMISSIONER OF THE SOCIAL | § |
| SECURITY ADMINISTRATION, | § |
| | § |
| Defendant. | § |

## MEMORANDUM OPINION AND ORDER

By consent of the parties and the order of transfer dated January 22, 2018 (doc. 10), this case has been transferred for the conduct of all further proceedings and the entry of judgment. Based on the relevant filings, evidence, and applicable law, the Commissioner's decision is **REVERSED**, and the case is **REMANDED** to the Commissioner.

### I. BACKGROUND[1]

Kristen Elaine Hitchcock (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying her claim for disability insurance benefits (DIB) under Title II of the Social Security Act. (*See* docs. 1; 14.)

**A.    Procedural History**

On July 3, 2014, Plaintiff filed her application for DIB, alleging disability beginning on July 12, 2012. (R. at 165-66.) Her claim was denied initially on November 21, 2014, and upon reconsideration on February 23, 2015. (R. at 55, 64.) On February 26, 2015, Plaintiff requested a

---

[1] The background information comes from the transcript of the administrative proceedings, which is designated as "R."

hearing before an Administrative Law Judge (ALJ). (R. at 86-87.) She appeared and testified at a hearing on August 11, 2016. (R. at 23-54.) On September 23, 2016, the ALJ issued a decision finding her not disabled and denying her claim for benefits. (R. at 9-22.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on November 22, 2016. (R. at 161-64.) The Appeals Council denied her request for review on October 2, 2017, making the ALJ's decision the final decision of the Commissioner. (R. at 1-4.) Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* doc. 1.)

**B.** **Factual History**

    **1.** **Age, Education, and Work Experience**

Plaintiff was born on February 5, 1971, and was 44 years old at the time of the hearing. (R. at 28, 165.) She had completed a year of college and could communicate in English. (R. at 30.) She had past relevant work experience as an administrative assistant, office manager, and production salesperson. (R. at 46-49.)

    **2.** **Medical Evidence**

On May 30, 2012, Plaintiff presented to podiatrist Dr. Timothy Buell for right heel pain. (R. at 356-57.) She reported a history of plantar fasciitis without relief despite orthotic inserts and foot exercises. (*Id*.) She was observed as not being in any distress, as well as having normal mood and behavior. (R. at 357.) An X-ray of her right foot showed no evidence of disease. (*Id.*) Dr. Buell administered a Kenalog injection to the right heel and prescribed Mobic. (R. at 356.) He administered a second steroid injection on July 12, 2012. (R. at 352.)

On September 7, 2012, Plaintiff presented to primary care physician Dr. James Siy, M.D., complaining of foot pain from plantar fasciitis. (R. 349-50.) She reported that steroid injections

would work for about 6 to 8 weeks. (R. at 349.) Upon examination, Dr. Siy noted tenderness at the plantar fascia, and he administered a steroid injection at the right heel. (R. at 350.)

On September 26, 2012, Plaintiff presented to nurse practitioner (NP) Dian Koelzer for a psychiatry medication appointment. (R. at 348-49.) She reported irritability, rage, depressed mood, anhedonia, fatigue, poor concentration, negative thoughts, and overeating. (R. at 348.) She presented with a slightly depressed mood and congruent affect, and was prescribed Wellbutrin and Zoloft. (R. at 349.)

On December 3, 2012, Plaintiff returned to NP Koelzer for mental health treatment. (R. at 343-44.) Despite taking her medication, she continued experiencing ongoing mild depression and anhedonia with irritability, fatigue, poor concentration, and negative thoughts. (R. at 343.) Examination revealed a slightly depressed affect and mostly bright mood. (R. at 344.) Plaintiff was instructed to increase Wellbutrin and continue with Zoloft. (*Id.*)

On January 7, 2013, Plaintiff presented to psychologist Amir Ramezani, Ph.D, for a pre-surgical psychological examination in order to be considered for a bariatric surgical procedure. (R. at 337-43.) She reported anger outbursts once a week despite medications, and her mental status examination revealed a "highly guarded" demeanor. (R. at 340.) She was observed as having normal behavior and speech, a euthymic mood, and good insight and judgment. (*Id.*) She denied suicidal and homicidal ideation. (*Id.*) She was assessed a Global Assessment of Functioning (GAF)[2] score of 71-80, which denoted "transient symptoms." (R. at 342.) Although Dr. Ramezani considered her "psychiatrically stable," he recommended a medication adjustment for her anger outbursts. (*Id.*)

---

[2] GAF is a standardized measure of psychological, social, and occupational functioning used in assessing a patient's mental health. *See Boyd v. Apfel*, 239 F.3d 698, 700 n. 2 (5th Cir. 2001) (citing *American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) (4th ed., rev. 2000)).

On April 24, 2014, Plaintiff presented to Lakepoint Foot & Ankle Clinic with persistent recalcitrant plantar fasciitis and was examined by Dr. Martin Sloane. (R. at 324.) She reported ongoing pain in the bottom of both heels, which radiated anteriorly and occasionally posteriorly, and that her foot problems had persisted for 10 years. (*Id.*) Examination revealed "[p]alpable tenderness proximal central band plantar fascia and deep to fascial origin central-to-medial aspect plantar heel bilateral," and moderate edema surrounding the proximal central band plantar fascia. (*Id.*) She was assessed with plantar fasciitis; compensated varus with pronated subtalar joint and midtarsal joint complex; and nerve entrapment syndrome. (*Id.*) Dr. Sloane advised her to use pre-formed orthotics, and he administered a Kenalog injection to the medial heel. (*Id.*)

On May 8, 2014, Plaintiff presented to Dr. Sloane and reported improvement since her injection. (R. at 324.) Her examination revealed minimal pain at fascia origin with compression. (*Id.*) When she returned on May 22, 2014, Plaintiff reported having recurrent plantar heel/arch pain, as well as low back pain. (R. at 325.) She was observed as having restricted range of motion in the left ankle and a positive Tinel's sign on the right with decreased sensation to light touch. (*Id.*) Dr. Sloane assessed her with plantar fasciitis, ankle equines, pes valgus, and tenosynovitis. (*Id.*) He prescribed new orthotics, which she received on August 22, 2014. (R. at 326.)

On September 8, 2014, Plaintiff presented to podiatrist Dr. Suzanne Smith for bilateral heel pain. (R. at 384-85.) The pain was more pronounced on the right heel, and she rated her pain as a six on a ten-point pain intensity scale. (R. at 384.) She also reported back pain. (*Id.*) Dr. Smith noted palpation of the plantar medial and central aspect of the right heel elicited moderate pain, as well as mild edema. (*Id.*) She also observed excessive pronation with weight-bearing and ambulation. (*Id.*) Plaintiff was provided with a night splint for the right foot, and assessed with

plantar fasciitis, tenosynovitis, bursitis, tendinitis, abnormal gait, foot pain, and difficulty walking. (R. at 384-85.)

On October 21, 2014, Plaintiff returned to Dr. Smith for a follow-up and reported a 25 to 50% improvement in her heel pain. (R. at 386.) Dr. Smith recommended a steroid injection, but Plaintiff declined the treatment. (*Id.*) There were no changes observed based on her physical examination, and her medical assessment remained the same. (*Id.*)

On November 19, 2014, state agency medical consultant (SAMC) Dr. Michael O'Callaghan, Ph.D, completed a Psychiatric Review Technique (PRT) for Plaintiff. (R. at 59-60.) He noted that she had an affective disorder, but found no significant functional limitations. (*Id.*) He also noted that Plaintiff had mild depression in 2010, but her last mental examination showed her depression had been well-managed by prescription medication. (*Id.*) Dr. O'Callaghan opined that the severity of her alleged intensity, persistence, and limiting effects of the symptoms caused by her mental impairments was "not fully supported" by the record. (*Id.*)

SAMC Laurence Ligon, M.D., completed a Physical Residual Functional Capacity Assessment for Plaintiff on November 17, 2014. (R. at 59-61.) He noted that she had "other and unspecified arthropathies," which he considered to be "severe" impairments. (R. at 59.) Dr. Ligon opined that Plaintiff could occasionally lift and/or carry 50 pounds; frequently lift and/or carry 20 pounds; stand and/or walk for a total of six hours in an eight-hour workday; sit for a total of six hours in an eight-hour workday; and push and/or pull without limitations, other than shown for lift and/or carry. (R. at 60-61.) He found that Plaintiff's allegations were "partially supported" by the evidence of record. (R. at 60.)

On February 23, 2015, Dr. Susan Thompson, M.D., affirmed Dr. O'Callaghan's PRT

5

assessment of Plaintiff. (R. at 71.) Likewise, Dr. Amita Hegde, M.D., affirmed Dr. Ligon's physical RFC assessment on February 20, 2015. (R. at 73.)

On April 13, 2015, Plaintiff presented to Dr. Smith for a follow-up for her right heel pain. (R. at 406.) Her left heel pain had resolved, but the pain in her right heel remained. (*Id.*) She also reported painful lesions at the end of the third toe of the left foot, and examination was positive for excessive pronation with weight-bearing and ambulation. (*Id.*) Dr. Smith administered a steroid injection to the right heel and debrided the lesion of the left third digit. (*Id.*) When Plaintiff returned to Dr. Smith the following week, she reported 60% improvement of the right heel pain. (R. at 407.) She continued to have some pain with weight-bearing, however. (*Id.*) She was administered a steroid injection to the right heel. (*Id.*)

Plaintiff saw Dr. Smith regarding her right heel pain between March and April of 2016. On March 2, 2016, Plaintiff reported having problems with her right heel "off and on". (R. at 399.) Dr. Smith noted moderate discomfort in response to palpation of the plantar medial and plantar central aspect of the right heel, as well as mild edema at the plantar aspect. (*Id.*) Plaintiff continued to demonstrate excessive pronation with weight-bearing and ambulation, and Dr. Smith administered a steroid injection to the right heel. (*Id.*) On March 17, 2016, Plaintiff reported little improvement despite the steroid injections, and her podothotics were adjusted. (R. at 400.) On April 14, 2016, she reported "consistent problems" with the right heel, and her last steroid injection had provided little relief. (R. at 401.) She also reported that her pain significantly interfered with her activities of daily living. (*Id.*) Dr. Smith noted no changes when physically examining Plaintiff and discussed the possibility of her undergoing surgery. (*Id.*)

On April 26, 2016, Plaintiff presented to Dr. Eric Williams, M.D., to establish care for

bipolar disorder. (R. at 409-10.) She reported getting "amped up" every two or three days, which would include anger outbursts, and kicking holes in walls when her symptoms became explosive. (*Id.*) Dr. Williams noted symptoms of depression and anxiety. (*Id.*)

On May 12, 2016, Plaintiff returned to Dr. Williams. (R. at 411-12.) She reported that since taking Seroquel, her mood had improved significantly and she did not experience any "blow ups." (R. at 411.) Dr. Williams assessed her with intermittent explosive disorder (IED) and Bipolar NOS (provisional) disorder. (R. at 412.) She was instructed to continue her medications. (*Id.*)

On June 21, 2016, Plaintiff presented to Dr. Williams for medication management for bipolar disorder and IED. (R. at 413-14.) She reported outbursts, noting that they were unpredictable but were usually triggered by "family stresses." (R. at 413.) She requested an assessment of the extent her mental disorders would interfere with her ability to work; she had not worked since 2009, and was unsure as to what she could tolerate for work. (*Id.*) Dr. Williams advised her to seek a provider with expertise in evaluating disabilities. (*Id.*) A mental status examination revealed a mildly depressed mood, but no manic, psychotic, or cognitive symptoms. (R. at 413-14.) Dr. Williams assessed Plaintiff with IED and likely bipolar spectrum illness. (R. at 414.) He was unsure "whether the IED was exclusively limited to mood episodes, or present at baseline," however. (*Id.*)

Plaintiff also received medical care from Dr. Matthew Britt of Podiatric Medical Partners of Texas. (R. at 416-18.) On June 30, 2016, Dr. Britt signed a doctor's note stating that he had evaluated Plaintiff and opined that she would be unable to stand for more than 10 minutes at a time "[d]ue to current condition." (R. at 418.)

3.     **Hearing Testimony**

On August 11, 2016, Plaintiff and a vocational expert (VE) testified at a hearing before the

ALJ. (R. at 23-54.) Plaintiff was represented by an attorney. (R. at 25.)

      *a.*      ***Plaintiff's Testimony***

Plaintiff testified that she was able to drive but would need to pull over after 20 minutes to stretch her back. (R. at 29.) She had to switch feet to operate the car peddles due to the plantar fasciitis in her right foot. (*Id.*) She drove herself to the hearing and had to stop to rest for five minutes on the way to the hearing. (R. at 30.) Plaintiff only completed a year of college because she got married and had children. (*Id.*) She could not work because of problems with her feet and IED, which had being going on for several years. (R. at 31.) She was diagnosed by Dr. Brownlee, but had not been able to get her medical records from him. (*Id.*) When asked how her disorder interfered with her work, Plaintiff responded that she did not believe that employers would hire someone with "the potential of blowing up to the extent that [she did]." (*Id.*) Since being on medication, she would "explode" once a day or every other day, but it was not something she could predict or control. (*Id.*) She described her explosive episodes as "fits of rage" during which she had thrown things and kicked holes in walls. (*Id.*) Her pain would trigger those episodes. (*Id.*)

Plaintiff had received injections for her nerve entrapment and multiple orthotics to correct her foot problems. (R. at 32.) The foot inserts would alleviate her heel pain, but would also cause toe numbness. (*Id.*) She had pain in both feet, but predominantly in the right foot. (R. at 32-33.) Elevation of her feet helped alleviate the pain, which she described as "stabbing" and "knifelike" when standing or walking, and as "constant throbbing" when her feet were elevated. (R. at 33.)

Plaintiff also experienced "constant" low back pain, which would be exacerbated when she needed to elevate her feet. (R. at 34.) She had difficulty with lifting, bending, and shaving her legs because of her back pain. (*Id.*) She could lift ten pounds "without straining" and stand for ten

minutes before needing to change positions. (*Id.*) She could sit for 15 to 20 minutes at a time before her back pain made her uncomfortable. (R. at 35.) While seated, she would need a lumbar pillow to support her back and something to prop up her feet. (*Id.*) If she alternated between sitting for 20 minutes and standing for 10 minutes, she could sit for two hours and stand for one hour in an eight-hour day. (R. at 36.) She would remain in a lying position on the floor and couch for the rest of the day. (*Id.*) She hired someone to clean the house, and her family would do the grocery shopping. (*Id.*) She could kneel, but struggled with bending because it strained her back. (R. at 37.)

Plaintiff did not have any problems with concentration or focus. (R. at 37.) She had a history of depression and had been prescribed medication for depression and bipolar disorder by a psychiatrist, Dr. Williams, since April 2016. (R. at 37-38.) Before that, she had been receiving her psychotropic medication through her general practitioner, Dr. Lam, who had been prescribing the same mediation that her prior psychologist, Dr. Brownlee, had prescribed her. (R. at 38.) Dr. Lam was also treating her for high cholesterol. (R. at 39.)

Plaintiff would experience swelling on her feet and used ice and an anti-inflammatory ointment for treatment. (R. at 39.) She could walk a block before needing to rest. (R. at 39-40.) Her bipolar disorder would cause her "manic type episodes," which she described as "a burst of energy," and she had the manic symptoms once a month. (R. at 40.) Since being on Trileptal, she had not been experiencing symptoms of depression. (R. at 41.) She agreed that her "biggest problem" was her "explosive disorder." (*Id.*)

When asked about her IED, Plaintiff agreed that medication would manage some of her symptoms, but she would still experience an episode once a day or every other day. (R. at 42.) Despite being medicated, she would still lose control both physically and verbally. (R. at 43.) Her

9

family would have to "walk on eggshells" around her, and she described her episodes as a "storm." (R. at 43-44.) She could not predict these "storms" and each "storm" would last three minutes at most. (R. at 44.) Her feet hurt often. (*Id*.) Since she started taking Seroquel, for the past year and half, her sleep had been "wonderful." (R. at 45.)

Plaintiff's last year of paid employment was in 2009. (R. at 46.) She was an administrative assistant for a year and a half and had worked 40 hours a week. (*Id*.) She worked half the time on her feet and occasionally had to lift up to 40 pounds. (R. at 46-47.) She left that job when she got pregnant with twins (R. at 47.) Before that, she was an office manager and production salesperson for a fencing company for eight and a half years. (R. at 47-48.) She worked 40 hours a week. (R. at 48.) She would spend 70 percent of the work day on her feet and would lift 20 pounds or less. (*Id*.) When asked about the maximum amount of weight she could currently lift, she responded that it would be 25 pounds, but not repetitively. (R. at 51.)

### b. *VE's testimony*

The VE characterized Plaintiff's past relevant work as an administrative assistant, which the Dictionary of Occupational Titles (DOT) classified as sedentary, skilled work with an SVP of 2. (R. at 50.) The VE testified that Plaintiff's role was more "light." (*Id*.) The VE also characterized her past work as an office manager, which the DOT classified as sedentary, skilled work with an SVP of 7, and a "project manager which was the sales part," classified by the DOT as light, skilled work with an SVP of 7. (*Id*.)

The VE considered whether a hypothetical individual of the same age, education, and past work experience as Plaintiff, could perform any of her past work with the following limitations: could lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; sit for 6 hours,

alternate to standing for 10 minutes after every 20 minutes of sitting; stand and walk for 2 hours total, alternate to sitting for 20 minutes after 10 minutes of standing and vice versa; occasional foot controls of both feet; occasional bilateral reaching overhead and in all other directions; occasionally climbing ramps and stairs; never climb ladders, ropes, or scaffolds; never balance, crouch, crawl, stoop, or kneel; never work near unprotected heights, moving mechanical parts, vibrations, or extreme cold and head; never drive as a job duty; occasionally exposed to weather; occasionally respond to supervisors and coworkers, but not the public; could deal with changes in the work setting, limited to simple work-related decisions; and be off task 15 percent of the time, in addition to normal breaks, in an eight-hour work day. (R. at 51-52.) The VE opined that the limitations of having to occasionally alternate between sitting, standing, and walking; only being able to reach occasionally in all directions; having no postural abilities; not being able to respond appropriately to coworkers more than on an occasional basis; and having to be off task 15 percent of the workday, would prevent the hypothetical individual from performing any of Plaintiff's past work, either as actually performed by Plaintiff or as generally performed in the national economy. (R. at 52.) These limitations would prevent the hypothetical individual from performing any other work. (R. at 52-53.) The VE testified that his testimony was consistent with the DOT. (R. at 53.) Plaintiff's attorney did not have any questions for the VE. (*Id.*)

C.  **ALJ's Findings**

The ALJ issued his decision denying benefits on September 28, 2016. (R. at 9-22.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity from her alleged onset date of July 12, 2012, through her date last insured of September 30, 2015. (R. at 14.) At step two, the ALJ found that she had the following medically determinable impairments: bilateral plantar

fasciitis; right heal spur; mild edema in the right heel; IED; depression; and obesity. (*Id.*) Despite those impairments, the ALJ found that Plaintiff did not have a severe impairment or combination of impairments. (*Id.*) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from July 12, 2012 through September 30, 2015. (R. at 18.)

## II. LEGAL STANDARD

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). The relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are also identical to those governing the

determination under a claim for supplemental security income. *See id.* Courts may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.*

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability.

*Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III. ISSUE FOR REVIEW

Plaintiff presents only one issue for review:

> In *Stone v. Heckler*, the Fifth Circuit held that a medical impairment is "non-severe" under the Social Security Act only if it would not be expected to interfere with the claimant's ability to work; otherwise, the impairment is "severe." Did the ALJ in this case reversibly err when he instead required Plaintiff to show her impairments "significantly limited" her ability to work and—finding no such impairment—denied her claim as a result?

(doc. 14 at 5.)

### IV. SEVERITY STANDARD

Plaintiff argues that the ALJ applied the incorrect severity standard at step two of the sequential analysis, resulting in the premature denial of her disability claim. (doc. 14 at 12.) The Commissioner concedes that the ALJ cited the incorrect severity standard at step two, but argues that the error was harmless because substantial evidence supports the ALJ's ultimate finding of non-severity. (doc. 17 at 5.)

The relevant regulation defines a severe impairment as "any impairment or combination of

impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Finding that a literal application of this regulation would be inconsistent with the Social Security Act, and may "impermissi[bly] . . . deny benefits to individuals who are in fact unable to perform 'substantial gainful activity,'" the Fifth Circuit has held that an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985). "Re-stated, an impairment is severe if it is anything more than a 'slight abnormality' that 'would not be expected to interfere' with a claimant's ability to work." *Salmond v. Berryhill*, 892 F.3d 812, 817 (5th Cir. 2018) (quoting *Loza v. Apfel*, 219 F.3d 378, 391 (5th Cir. 2000)).

To ensure that the regulatory standard for severity does not limit a claimant's rights, the Fifth Circuit held in *Stone* that it would assume that the ALJ and Appeals Council applied an incorrect severity standard, and would remand the case, unless the correct standard was set forth by reference to *Stone* or a similar opinion or by an "express statement" that the ALJ used *Stone*'s construction of the severity regulation. *Stone,* 752 F.2d at 1106; *accord Loza*, 219 F.3d at 393. Nevertheless, the Fifth Circuit has held that *Stone* error does not mandate automatic reversal and remand, and application of harmless error analysis is appropriate, in cases where the ALJ proceeds past step two of the sequential evaluation process. *See, e.g.*, *Taylor v. Astrue*, 706 F.3d 600, 603 (5th Cir. 2012) (per curiam); *see also Goodman v. Comm'r of Soc. Sec. Admin.*, No. 3:11-CV-1321-G BH, 2012 WL 4473136, at *9–10 (N.D. Tex. Sept. 10, 2012), *recommendation adopted*, 2012 WL 4479253 (N.D. Tex. Sept. 28, 2012); *Jones v. Astrue*, 821 F. Supp. 2d 842, 851 (N.D. Tex. 2011).

As some courts have explained, however, "*Stone* and post-*Stone* Fifth Circuit cases" continue

to "hold that an ALJ's failure to apply the proper severity standard requires [automatic] remand when the ALJ ends his analysis at step two and finds that a claimant is not disabled because he has no severe impairments." *Foster v. Astrue*, No. CIV.A. H-08-2843, 2011 WL 5509475, at *14 (S.D. Tex. Nov. 10, 2011); *see also he Rollins v. Berryhill*, No. 7:17-CV-00136-BP, 2018 WL 2064781, at *5 (N.D. Tex. May 2, 2018) ("Automatic remand is only required in cases where the ALJ used the incorrect standard and did not proceed past step two."); *cf. Adams v. Bowen*, 833 F.2d 509, 512 (5th Cir. 1987) (holding ALJ's failure to make a severity finding at step two not a basis for remand where ALJ proceeded to later steps of the analysis). Automatic reversal of cases where benefits are "prematurely" denied at step two, and application of harmless error analysis in cases where the ALJ proceeds past step two despite the *Stone* error, is appropriate since "*Stone* merely reasons that the [severity] regulation cannot be applied to summarily dismiss, *without consideration of the remaining steps in the sequential analysis*, claims of those whose impairment is more than a slight abnormality." *Anthony v. Sullivan*, 954 F.2d 289, 294 (5th Cir. 1992) (emphasis added); *see also Jones*, 821 F. Supp. 2d at 851 (holding that application of harmless error analysis is appropriate where the ALJ proceeds past step two and does not "prematurely" deny benefits "based on an improper determination of 'non-severity'") (listing post-*Stone* Fifth Circuit cases).

Here, the ALJ did not cite to *Stone* or provide any indication that he applied the *Stone* severity standard in finding that Plaintiff did not have a severe impairment or combination of impairments. (*See* R. at 13-14.) He instead cited the severity definition set forth in 20 C.F.R. § 404.1520(c), which *Stone* found to be inconsistent with the Social Security Act, and he also stated that "an impairment or combination of impairments is 'not severe' when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more

16

than a minimal effect on an individual's ability to work." (R. at 13 (citing 20 C.F.R. § 401.1521; SSRs 85-28, 96-3p, and 96-4p)). Based on this severity standard, he determined that Plaintiff's physical and mental impairments, considered singly and in combination, did not significantly limit her ability to perform basic work activities. (R. at 18.) The ALJ concluded that Plaintiff was not under a disability, as defined by the Social Security Act, from July 12, 2012 through September 30, 2015. (*Id.*)

*Stone* provides no allowance for a minimal interference with a claimant's ability to work. *Stone*, 752 F.2d at 1104. Given the difference between these two constructions and the ALJ's failure to cite to *Stone*, he applied an incorrect standard of severity. *See Garcia v. Astrue*, No. 3:08-CV-1881-BD, 2010 WL 304241, at *3 (N.D. Tex. Jan. 26, 2010) (explaining that courts in this district have consistently rejected, as inconsistent with *Stone*, the definition of severity under 20 C.F.R. § 404.1520(c) that the ALJ cited in this case); *see also Lawson v. Astrue*, No. 4:11-CV-00426, 2013 WL 449298, at *4 (E.D. Tex. Feb. 6, 2013) (noting "while the difference between the two statements appears slight, it is clear that the [regulatory definition] is not an express statement of the *Stone* standard"). Because the ALJ made his disability determination and denied benefits at step two based on an incorrect severity standard, and he did not proceed to the remaining steps of the disability evaluation process, harmless error analysis is unnecessary, and his *Stone* error requires remand.

## V. CONCLUSION

The Commissioner's decision is **REVERSED**, and the case is **REMANDED** to the Commissioner for reconsideration.

**SO ORDERED**, on this 12th day of March, 2019.

_____
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE